**In the United States District Court
for the District of Kansas**

———————

Case No. 23-cr-40037-TC

———————

UNITED STATES OF AMERICA,

*Plaintiff*

v.

JOSEPH K. MURDOCH, ET AL.,

*Defendants*

———————

**MEMORANDUM AND ORDER**

A grand jury indicted Joseph K. Murdoch and Manuel Ricky Meza for one count of conspiracy to distribute and possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). Doc. 1. Defendants now move to suppress physical evidence seized during a traffic stop and the statements they made to law enforcement during that stop. Docs. 169 & 174. For the following reasons, Defendants' motions are denied.

**I**

**A**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (recognizing incorporation against the states). Absent a recognized exception, the Fourth Amendment prohibits warrantless searches that violate a person's objectively reasonable expectation of privacy by invading a constitutionally protected space or thing. *United States v. Jones*, 565 U.S. 400, 406 (2012); *see also United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016). Traffic stops are seizures for Fourth Amendment purposes, *United States v.*

*Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015), and in a traffic stop "a passenger is seized as well and so may challenge the constitutionality of the stop." *Brendlin v. California*, 551 U.S. 249, 251 (2007). A warrantless stop is valid where the officer has reasonable suspicion to believe that a traffic violation occurred. *Kansas v. Glover*, 589 U.S. 376, 380 (2020).

"Reasonable suspicion" is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Glover*, 589 U.S. at 380 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). The inquiry depends on "the totality of the circumstances." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Cortez*, 449 U.S. at 417). The emphasis is on the "whole picture," *Cortez*, 449 U.S. at 417, and rejects a "divide-and-conquer analysis" of a situation's relevant factors. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). While a mere "hunch" is not enough, "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (quotation marks omitted).

The analysis is an objective one. An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed *objectively*, justify [the] action." *Brigham City v. Stuart*, 547 U.S. 398, 404–05 (2006) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)) (emphasis in original). The officer's subjective motivation is irrelevant. *Id.*; *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers."). That said, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them. *Arvizu*, 534 U.S. at 273; *see also Cortez*, 449 U.S. at 418-20 (remarking that "when used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion" while describing the officers' investigation of the chevron-soled human trafficker).

**B**

**1.** On August 10, 2022, Murdoch and Meza were driving eastbound on Interstate 70 in Colorado. Doc. 180 at 2.[1] On that day, Detective Jordan M. Harrison with the Eagle County, Colorado Sherriff's Office was using a license plate reader to review the travel behavior of vehicles entering Colorado. *Id.* at 1–2. Harrison observed a Ford Explorer with Kansas plates and chose to review its travel behavior. *Id.* He noticed that it had traveled southbound through Jean, Nevada on August 9, 2022, at 9:26 a.m., only to return northbound through Primm, Nevada at 8:53 p.m. on the same day. *Id.* at 1. Based on this information, Harrison concluded that the Explorer was in California for approximately twelve hours. *Id.* at 1–2. Harrison believed this travel behavior was "consistent with bulk narcotics smuggling." Doc. 174-1 at 4.

Harrison later observed the Ford Explorer, witnessed it engage in a traffic violation, and initiated a traffic stop. *Id.* He approached the vehicle and observed that Meza was driving. Doc. 169 at 4. Harrison asked Meza about Defendants' trip. *Id.* Meza, who was unaware that Harrison possessed the license plate reader data, told Harrison that he and Murdoch had spent three days in the Los Angeles, California area. Doc. 174-1 at 4. Harrison "knew this statement to be a lie due to the previously observed license plate reads." *Id.* Another officer, Detective Antonio, talked to Meza and Murdoch while Harrison prepared a warning in his patrol vehicle. *Id.* Meza told Antonio that they were in California to visit Meza's grandmother, that Meza's girlfriend rented the vehicle, and that Murdoch joined Meza's trip because he might want to visit his family in Denver. *Id.*

Harrison returned to the Explorer, checked the VIN, and issued a written warning to Meza. *Id.* He informed Meza that "he was free to go." *Id.* Harrison then began to ask Meza additional questions. *Id.* Meza said he was in California for three days, that he stayed with his grandmother, and that they went to Las Vegas for a few hours. *Id.* After further discussion, Harrison concluded he had reasonable suspicion that criminal activity was occurring. *Id.* He told Meza that he knew he had lied about his travel behavior and that a drug dog was coming to the scene. *Id.*

---

[1] All document citations are to the document and page number assigned in the CM/ECF system.

Ultimately, Officer Becca Anderson arrived with her K-9 Echo, but Echo did not alert to the vehicle. *Id.* Harrison states that "it was obvious that K-9 Echo was not sniffing the vehicle" and that "Anderson advised [him] that for an unknown reason K-9 Echo would not sniff the vehicle." *Id.* Harrison therefore released Murdoch and Meza but contacted Kansas law enforcement officials to inform them of what he observed. *Id.*

**2.** Deputy Andrew Toolin, a Kansas law enforcement officer, received the information from Harrison and communicated it to other officers. Doc. 174-4 at 3. Trooper Andrew Voss, who had received this information, saw the Explorer traveling eastbound on Interstate 70 and began to follow it. Doc. 169-3 at 9. He explains his observations as follows:

> As I was catching up to the vehicle, it drove to the right and drove on top of the white fog line. The vehicle then moved back to the left, then back to the right and drove onto the white fog line again. The vehicle continued to drive on top of the white fog line for over 100 feet. The vehicle moved slightly to the left so that the right-side tires were not touching the white fog line. The vehicle moved back to the right and drove on top of the white fog line again. The vehicle continued driving on top of the white fog line for a short distance then both right side tires went over the white fog line. The vehicle moved slightly to left and continued to drive on top of the white fog line for several hundred feet. The vehicle appeared to naturally drift over and onto the white fog line. No turn signal was activated or utilized on the vehicle when the vehicle was drifting onto and over the white fog line.

*Id.* Voss initiated a traffic stop on the basis of the fog-line violation. *Id.*

Voss approached the vehicle and observed that the driver, who was now Murdoch, was smoking a lit cigarette. *Id.* Voss also saw a "red Little Tree air freshener," which he could smell. *Id.* Voss asked where Defendants were headed, and Meza replied, "home in Salina." *Id.* Unlike what they had previously told the Colorado officer earlier in the day, Meza stated that they were returning from Wakeeney, where they were visiting Meza's grandmother. *Id.* When Voss asked when they left for Wakeeney, "Meza fumbled with his words as if he was trying to

4

think of an answer then said they left earlier today." *Id.* Based at least in part on the information learned by the Colorado officer's inquiry earlier in the day, Voss believed that Meza was lying. *Id.*

Murdoch provided Voss the vehicle's rental agreement. *Id.* Neither Murdoch nor Meza was listed as an authorized driver. *Id.* Meza told Voss that his girlfriend Courtney Shannon rented the vehicle. *Id.* Voss returned to his vehicle while Meza and Murdoch remained in the Explorer. *Id.* Another officer, Trooper Robert Krause, arrived to assist. *Id.* Voss ultimately returned to the Explorer and gave Murdoch his license and information back. *Id.* He also gave Murdoch a warning for "failing to maintain a lane." *Id.* Voss told Murdoch and Meza "to be safe and walked back towards [his] patrol vehicle." *Id.* at 10.

But Voss, who had not yet cleared the length of the rental car, was not done. Instead, he turned around and walked back to the driver's window of the vehicle. While doing so he saw that Murdoch "was reaching for the gear shifter on the center console" and that the brake lights were activated." *Id.* Meza asserts that the "video shows Voss standing very closely to the driver door where it would be unsafe for Murdoch to drive away." Doc. 174 at 5. Voss asked Murdoch, "Do you mind if I ask you a few more questions?" Murdoch's response is unascertainable. Voss asked again, "Do you mind if I ask you a few more questions?" Voss then began to ask various questions of Murdoch, including when they left Salina, how much time they spent in Wakeeney, how long it took them to get from Salina to Wakeeney, and how long that drive should typically take. *Id.* Throughout this encounter, Voss noticed that Murdoch was using a phone-based mapping system, which he found unusual for someone in Salina, Kansas using when travelling to their relative's home in Wakeeney, Kansas.

Ultimately, Voss asked for consent to search the vehicle. Meza declined. *Id.* Voss then asked if Murdoch would consent to a K-9 search, but Murdoch stated he already got a ticket and asked if he was free to go. *Id.* Voss did not allow them to leave and instead asked Meza and Murdoch to step out of the vehicle. *Id.* He did a pat down on Murdoch to check for weapons and then asked both defendants to wait near the guardrail. *Id.*

Captain Scott Walker arrived with a K-9, who "indicated on the vehicle." *Id.* Voss and Krause searched the vehicle and found substances that they believed to be methamphetamine and cocaine. *Id.*

5

Murdoch and Meza were arrested for the methamphetamine in the vehicle and read their *Miranda* rights. *Id.*

**3.** Following their arrest, a grand jury indicted Murdoch and Meza on two counts. Doc. 1 at 1–3. The first is conspiracy to distribute and possess with the intent to distribute methamphetamine in violation of 21 U.S.C. § 846. *Id.* at 1–2. And the other is possession with the intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). *Id.* at 2–3.

Murdoch and Meza now move to suppress the evidence seized from the Explorer on two grounds. Docs. 169 & 174. First they argue that the evidence should be suppressed because Voss did not have reasonable suspicion to initiate a traffic stop or to extend that stop once Voss completed the purpose of the initial stop.[2] Doc. 169 at 10–14; Doc. 174 at 12–13. And second, even if the initial stop was appropriate, they contend it should have concluded because it was neither a consensual encounter nor justified by reasonable suspicion. Doc. 169 at 15–16; Doc. 174 at 13–20. These arguments were fully addressed and argued at an evidentiary hearing.[3] Doc. 195.

---

[2] Defendants disclaimed any argument that Voss unlawfully detained them between the time that he completed the purpose of the initial stop and the time that he returned Murdoch's documents and told Defendants to "be safe." *See Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015) (holding that a traffic stop must conclude once its mission has been accomplished).

[3] The Government contends that Murdoch and Meza each lacks standing to challenge the search that uncovered the evidence at issue in their motions. Doc. 180 at 11, 13 (arguing that Meza and Murdoch lack standing because they lacked a possessory interest in the vehicle, a reasonable expectation of privacy in the vehicle, and because they were lawfully detained). There are legitimate reasons to question whether Defendants have the requisite standing to raise their challenges. *See United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003) (noting that a defendant driving a third-party's vehicle must "advance evidence showing that he reasonably believed that the lender was someone with authority to grant possession"); *United States v. DeLuca*, 269 F.3d 1128, 1131 (10th Cir. 2001) (explaining by way of a hypothetical that even if the officers had allowed the passenger to leave the scene, they would still have found the evidence because it was in a vehicle owned by the driver "who was not going anywhere until his vehicle had been searched").

## II

Murdoch and Meza have not identified a Fourth Amendment violation. Voss had reasonable suspicion to conduct the initial traffic stop. And the search following that traffic stop was justified because Voss had developed reasonable suspicion on the strength of the information known to him before and during the traffic stop or, in the alternative, learned by him during the subsequent consensual encounter. As a result, Defendants' motions to suppress are denied.

## A

The initial stop in Lincoln County, Kansas was lawful.[4] Based on the totality of the circumstances, Voss had reasonable suspicion to believe that Murdoch, who was driving the Explorer, violated Kan. Stat. Ann. § 8-1522(a).

Section 8-1522(a) requires drivers to stay "as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." K.S.A. § 8-1522(a). The Kansas Supreme Court has interpreted this language to mean that a driver must "keep entirely within a single lane while traveling on a roadway with two or more clearly marked lanes." *State v. Marx*, 215 P.3d 601, 673 (Kan. 2009). But a driver may stray from that lane "when it becomes impracticable to stay within the lane markers" or "when the driver is properly effecting a lane change." *Id.* A violation requires "more than an observation of one instance of a momentary lane breach." *Id.*

The dashcam footage confirms that Murdoch violated Kan. Stat. Ann. § 8-1522(a). It shows the Explorer cross over the white "fog line" on the right side of the highway multiple times within one minute. *See* Doc. 195-3. Because this amounts to more than a "momentary lane breach," Voss had reasonable suspicion to initiate a traffic stop. *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001) (explaining

---

[4] Defendants do not challenge the lawfulness of the first stop initiated by Detective Harrison in Eagle County, Colorado. Nor do they challenge the Kansas officers' reliance on the information gained from that Colorado stop. *See United States v. Latorre*, 893 F.3d 744, 753–54 (10th Cir. 2018) (explaining in what circumstances the "vertical collective knowledge" doctrine allows an officer to rely on another officer's reasonable suspicion).

that a traffic stop is valid "if the stop is based on an observed traffic violation"); *United States v. Barraza-Martinez*, 364 F. App'x 453, 458 (10th Cir. 2010) (finding that a traffic stop was justified by reasonable suspicion where the video evidence showed that the vehicle "strayed out of its lane multiple times over a short distance without adverse physical conditions" in violation of Kan Stat. Ann. § 8-1522(a)).

Defendants' argument to the contrary is that Voss provoked the traffic violation. In particular, they claim Voss raced his patrol vehicle up to the left side of the Explorer, and, as a result, "Murdoch's act of moving to the right and making room for a highway patrolman who was following closely was a reasonable act." Doc. 169 at 11. They rely on three district court decisions to support their position. *See United States v. Esteban*, 283 F. Supp. 3d 1115, 1129 (D. Utah 2017) (holding no reasonable suspicion existed when the officer "provoked the two-second traffic violation" by significantly increasing his speed, passing emergency vehicles on the side of the road, and approaching the defendant's vehicle quickly from behind); *United States v. Ochoa*, 4 F. Supp. 2d 1007, 1011 (D. Kan. 1998) (finding no reasonable suspicion where the officer caught up to the car, pulled into the passing lane, and drove alongside the car, causing it to "momentarily drift[ ] … to the right shoulder"); *Shaw v. Jones*, 683 F. Supp. 3d 1205, 1227 (D. Kan. 2023) (holding there was no reasonable suspicion to stop a vehicle that drove over the fog line after the officer drove "dangerously close" to the vehicle and "blinded and distracted" the driver with his head lights). This provocation position has many failings.

For one thing, the decisions of a "federal district court judge [are] not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."*Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)). But even if they were, they are factually distinguishable. Voss was driving in the left lane, behind Defendants, while they traveled in the right lane. And Voss credibly testified that he was at least 75-100 feet away from the Explorer when it was crossing over the fog line. That testimony was consistent with the video evidence played at the hearing. Defendants have not shown that Voss drove "dangerously close" to the vehicle or otherwise created a situation that would make it unsafe for Murdoch to stay within the right lane of the interstate.

And for another, the Tenth Circuit, while not expressly rejecting the reasoning in those cases, has noted that the principle in those cases is narrow, if it exists at all. *See Esteban*, 283 F. Supp. 3d at 1129 (noting

8

that the Tenth Circuit "has considered and distinguished *Ochoa* in later cases without disavowing its reasoning"). In particular, it has explained that even if an officer's actions are a "but-for" cause of the traffic violation, the traffic stop is still valid if a reasonable driver would not have needed to commit the traffic violation to react to the officer's behavior. *United States v. Worthon*, 520 F.3d 1173, 1180 (10th Cir. 2008). In *Worthon*, an officer pulled the defendant over after the defendant was following the officer's vehicle too closely in violation of Kansas law. *Id.* Even though this traffic infraction did not occur until the officer slowed down while driving in front of the defendant, the Tenth Circuit explained that "there was no reason why [the defendant] could not have slowed down accordingly." *Id.*; *see also United States v. Ozbirn*, 189 F.3d 1194, 1198–99 (10th Cir. 1999) (distinguishing *Ochoa* because the officer "did not contribute to causing the [vehicle] to drift onto the shoulder").

The facts in this case comfortably fall within the rule announced by the Tenth Circuit in *Worthon*. *See United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) (explaining that district courts must follow circuit precedent). Murdoch did not need to drift out of his lane to make room for Voss's vehicle that was traveling at least 75–100 feet behind Defendants. And there is no evidence that weather conditions or extraordinary circumstances, such as wind, other vehicles, or debris in the road, required or caused Murdoch to drift out of his lane on multiple occasions. Even if Murdoch reasonably crossed the fog line to make room for an emergency vehicle (whose emergency equipment was not activated), Voss still had the requisite suspicion to initiate a stop based on Murdoch's traffic violation. *See United States v. Cline*, 349 F.3d 1276, 1286–87 (10th Cir. 2003) (affirming that reasonable suspicion supported a stop because neither road conditions nor officer conduct caused the driver to swerve in violation of Kan. Stat. Ann. § 8-1522).

**B**

By the time he had accomplished the purpose of the traffic stop and returned the paperwork to Murdoch, Voss had two independent reasons to extend the stop that led to the K-9 search. One is that he had reasonable suspicion that Murdoch and Meza were involved in drug trafficking. The other is that the stop became a consensual encounter when Voss returned the paperwork, told Defendants to "be safe," and began to walk away from the Explorer.

9

1

Armed with the information known before and during the traffic stop, Voss had reasonable suspicion of drug trafficking to extend the traffic stop. His observations, combined with his experience with drug trafficking crimes and seizure, support this finding. Among other things, Voss considered Defendants' quick turnaround trip to California and back to Kansas, their inconsistent and implausible travel plans shared with both the Colorado officer and him, the overwhelming odors in the vehicle, and the fact that a third-party—who was not present—had rented the vehicle. Doc. 180 at 29–30.

The Tenth Circuit has found many of these same observations to support reasonable suspicion to conduct a search. For instance, the Tenth Circuit has consistently held that implausible travel plans can contribute to reasonable suspicion. *Pettit*, 785 F.3d at 1381; *see also United States v. Santos*, 403 F.3d 1120, 1130–32 (10th Cir. 2005) (finding that inconsistent, vague, or evasive answers regarding travel plans contributed to reasonable suspicion). Even where implausible travel plans are consistent with innocent conduct, they may still contribute to reasonable suspicion when taken together with other factors. *Sokolow*, 490 U.S. 1, 9–10.

There was reason to believe that the travel stories were a ruse to cover up drug trafficking. In particular, Voss was aware of the license plate reader information suggesting travel into and out of California within twelve hours. But both Meza and Murdoch told stories that contradicted this information and each other. For example, Meza told the Colorado officer that they had been in California for three days, stopped in Las Vegas for a few hours, and were driving back to Kansas. Doc. 174-1 at 4. Yet just a few hours later, Murdoch told Voss that the pair were coming from Wakeeney, Kansas, that they had been there for a few hours visiting family, and had left Wakeeney earlier that day. Doc. 169-3 at 9. Voss testified that he knew this account was false based on the information he learned from Colorado officers and his knowledge of central and western Kansas and the distance between the relevant cities. These observations about Defendants' travel plans contributed to Voss's reasonable suspicion of criminal activity.

Even if Murdoch and Meza had not misled the officers about their travel plans, their quick sojourn into and out of California was suspicious. Although the mere fact that Defendants were coming from a source city is not a proper consideration, the Tenth Circuit has held

10

that "[t]o make such a long trip—only to stay at the destination for such a short amount of time—is also consistent with the behavior of a drug courier." *United States v. Batara-Molina*, 60 F.4th 1251, 1257 (10th Cir. 2023); *see also Simpson*, 609 F.3d at 1151. Voss knew, based on the information from the Colorado stop, that Defendants drove from Kansas to California only to stay in California for less than twelve hours before returning to Kansas. This is consistent with the officers' suspicions that Murdoch and Meza were trafficking narcotics. *See Simpson*, 609 F.3d at 1151–52 (finding that the choice to drive cross country only to stay for one night contributes to the reasonable suspicion analysis).

Additionally, Voss noticed two different attempts to mask odors. The Tenth Circuit has recognized that overwhelming odors may also contribute to reasonable suspicion. *Batara-Molina*, 60 F.4th at 1256 n.2. This is because "a strong odor may give rise to reasonable suspicion on the part of law enforcement officials that the odor is being used to mask the smell of drugs." *Id.* at 1256 (quoting *United States v. Salzano*, 158 F.3d 1107, 1114 (10th Cir. 1998)). Voss identified that he could smell the air freshener and the lit cigarette that Murdoch was smoking. Doc. 180 at 30. The credibility of Voss's assertion is bolstered by Trooper Krause's statement after he arrived to conduct the dog sniff that the "odor of cigarettes and air freshener were overwhelming." *Id.* at 7. In conjunction with the other factors, Voss's observation contributed to reasonable suspicion.

Finally, the defendants were driving a vehicle rentend by someone who was not present. The Tenth Circuit has held that driving a third-party's rental vehicle is "properly considered suspicious." *Batara-Molina*, 60 F.4th at 1257. This is because "the fact that a rental was made by a third-party is consistent with the behavior of drug traffickers." *Id.* (citing *United States v. Williams*, 271 F.3d 1262, 1270 (10th Cir. 2001)). Murdoch and Meza were driving a rental vehicle that Meza's girlfriend, Courtney Shannon, rented. Doc. 7–9. But Shannon was not present in the vehicle at the time of the stop. *Id.* Accordingly, Voss properly considered this factor in his reasonable suspicion analysis. *Williams*, 271 F.3d at 1270 ("The officer knew from his training and experience that drug couriers often use third-party rental cars.").

Defendants' arguments against reasonable suspicion are unavailing. They depend, in large part, on a "divide-and-conquer" analysis that attempts to attribute innocent explanations to the things Voss observed. That will not do.

11

Courts are "not [to] examine each factor adding up to reasonable suspicion individually," but should "evaluate how convincingly they fit together into a cohesive, convincing picture of illegal conduct." *United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007); *see also United States v. Lopez-Martinez*, 25 F.3d 1481, 1484 (10th Cir. 1994) ("Our task … is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious."). The law requires looking at each nuance of the encounter as part of a larger mosaic to determine whether the "whole picture" suggests that criminal behavior may be afoot. *Cortez*, 449 U.S. at 418. And while each of the factors that Voss relied on may have one or more innocent explanations, his training and experience justifies his suspicion that, based on the totality of the circumstances, Murdoch and Meza were engaged in wrongdoing beyond the initial traffic stop. Voss was entitled to rely on his training to draw inferences and make deductions even though, as *Cortez* noted, those "inferences and deductions … might well elude an untrained person." *Id.*; *Batara-Molina*, 60 F.4th at 1259 (finding that a cover odor, third-party rental, and a rental expiration that was soon to expire supported reasonable suspicion of additional criminal activity sufficient to extend the traffic stop); *United States v. Davis*, 636 F.3d 1281, 1291–92 (10th Cir. 2011) (finding that inconsistent explanations of travel plans, use of a rental vehicle, abnormal nervousness, and prior criminal history supported reasonable suspicion to extend a traffic stop).

### 2

Even if Voss had not developed reasonable suspicion by the end of the initial stop, the stop became a consensual encounter after Voss returned Murdoch's paperwork, told him to "be safe," and started to walk away from the vehicle. Under binding circuit precedent, a law enforcement officer, after completing a traffic stop, may engage the driver in a consensual encounter, during which the officer may question the driver. *United States v. Gomez-Arzate*, 981 F.3d 832, 842 (10th Cir. 2020); *but see Shaw v. Jones*, 683 F. Supp. 3d 1205, 1247 (D. Kan. 2023) (holding that a "reasonable driver could not knowingly and intelligently believe" the driver is free to leave when an officer performs the two-step manuever). "A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." *United States v. Mercado-Gracia*, 989 F.3d 829, 836 (10th Cir. 2021) (quoting *Gomez-Arzate*, 981 F.3d at 842). When determining whether an encounter is consensual, the focus is on police conduct—specifically, whether it "would have conveyed to a

reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." *Id.* (quoting *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005)).

The Government bears the burden to prove the police stop became consensual. *United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017). The Tenth Circuit has held that there is a bright-line rule that requires the driver's documents to be returned before the encounter may become consensual. *Mercado-Gracia*, 989 F.3d at 836. But that alone is not sufficient. The Tenth Circuit considers several non-exclusive factors when analyzing an extended stop, including:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*Id.* (quoting *Gomez-Arzate*, 981 F.3d at 842). No one factor is dispositive—the focus remains on "the coercive effect of police conduct, taken as a whole on a reasonable person." *Id.*

The Government has shown that the stop became consensual. To begin with, all parties agree that Voss returned all of Murdoch's documents, including his driver's license and the rental agreement. Doc. 169-3. This satisfies the prerequisite to a consensual extension of a traffic stop. *Mercado-Gracia*, 989 F.3d at 836. There was nothing more Defendants would have needed to retrieve from Voss before they could leave.

Most of the *Mercado-Gracia* factors also support the Government's position. Defendants do not allege that Voss touched or physically restrained them, nor that Voss unholstered his firearm. Voss was the only officer speaking with Murdoch and Meza at the vehicle and he was walking in a direction away from their vehicle and to his. The location factor weighs in favor of finding a consensual encounter

because the encounter occurred in a public place. *See United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (holding that the shoulder of a highway is a public location). Moreover, "'the typical traffic stop is public, at least to some degree,' there are witnesses, and the 'exposure to public view' reduces a person's fear of abuse if he or she does not cooperate." *United States v. Ward*, 961 F.2d 1526, 1531 (10th Cir. 1992) (quoting *INS v. Delgado*, 466 U.S. 210, 224 (1984) (Powell, J., concurring in the result)). Further, the recording of the stop supports the Government's claim that Voss did not use a commanding or intimidating tone in the encounter. *See* Doc. 180 at 27. And none of Meza's or Murdoch's personal effects remained in Voss's possession. *See* Doc. 169-3. These factors show that Voss did not coerce Murdoch and Meza into consenting to further questioning.

Only one *Mercado-Gracia* weighs in Defendants' favor, but the circumstances of the stop mitigate its impact. Voss continued to question Defendants without expressly telling them that they were "free to leave." *See* Doc. 169-3 at 10. But this factor does not undermine the validity of Defendants' consent in this case because an officer need not specifically use those words before an encounter can become consensual. *United States v. West*, 219 F.3d 1171, 1176–77 (10th Cir. 2000); *see also Ohio v. Robinette*, 519 U.S. 33, 39–40 (1996) (rejecting a *per se* rule "requir[ing] police officers to always inform detainees they are free to go" before obtaining voluntary consent).

In sum, under the totality of the circumstances and in light of existing Tenth Circuit decisions that are factually similar, a reasonable person would have felt free to drive away instead of answering more questions. The stop therefore became consensual before Voss questioned Defendants further. And because the encounter became consensual, it "do[es] not implicate the Fourth Amendment." *United States v. Hammond*, 890 F.3d 901, 904 (10th Cir. 2018) (quoting *United States v. Davis*, 94 F.3d 1465, 1467 (10th Cir. 1996)).

Defendants' counterarguments are not persuasive. In essence, they argue that the traffic stop became an unlawful detention after Voss performed the "two-step" by walking away from the vehicle only to turn around and ask additional questions. Doc. 169 at 15–16; Doc. 174 at 13–20. That argument, as noted previously, is foreclosed by binding

circuit precedent.[5] *See Bradford*, 423 F.3d at 1159 (finding that the encounter was consensual where the officer returned the defendant's documents, told her to have a safe trip, and then reapproached her to ask a few more questions); *Ledesma*, 447 F.3d at 1315 (finding a consensual encounter when the officer returned the documents, said "[t]hank you girls, You have a safe one," and then began to ask additional questions); *Guerrero*, 472 F.3d 784 at 789 (finding a consensual encounter where the officer gave the defendants' documents back, thanked them for their time, began walking way but turned around and asked more questions).

Defendants also assert that Voss was so close to the car that they could not safely drive away, Doc. 174 at 5, presumably because he had not yet walked past their tail lights before returning. But they do not cite any authority suggesting that this would make a reasonable person feel that they were not free to leave. And, in any event, the video evidence fails to sustain the position that Voss was so close that Defendants could not safely leave.

At the motion hearing, Defendants asserted that the encounter did not become consensual because Voss would not have allowed Defendants to leave had they tried. But Voss's subjective intent is irrelevant. *Bradford*, 423 F.3d at 1158. It matters only whether Defendants had an "objective reason to believe [they were] not free to end the conversation with the officer and proceed on [their] own way." *Id.* As explained above in discussing the *Mercado-Gracia* factors, Voss's actions were such that a reasonable person in Defendants' position to would have believed they were free to leave. Indeed, if the rule was as Defendants' propose, there could never be a consensual encounter when an officer subjectively believed he or she had reasonable suspicion.

---

[5] This "two-step" maneuver is not an uncommon practice for Kansas Highway Patrol officers seeking to signal the end of a stop but then quickly engage a driver in additional, consensual conversation. Although the practice has been legitimately criticized as a ruse to obtain consent to ask further questions, that criticism is an insufficient basis to ignore binding precedent. *Millard v. Camper*, 971 F.3d 1174, 1177 (10th Cir. 2020) (reversing district court's ruling because it "contravenes binding Supreme Court and Tenth Circuit precedent").

## C

The foregoing conclusions preclude Defendants' request for suppression. Specifically, Defendants argue that the physical evidence found in the car and any statements they made to law enforcement after the evidence was uncovered should be suppressed. Doc. 169 at 15–16; Doc. 174 at 21–22. But all of these arguments have been rejected. *See* Parts II.A. & B., *supra*. During the lawful encounter, the K-9 alerted to the presence of narcotics, which gave the troopers probable cause to search the Explorer's interior. *United States v. Kitchell*, 653 F.3d 1206, 1222 (10th Cir. 2011) (recognizing the "well-established principle that a positive alert from a reliable narcotics-detection dog gives rise to probable cause to search a vehicle"). As a result, Defndants are not entitled to suppression.

## III

For the foregoing reasons, Murdoch's and Meza's motions to suppress, Docs. 169 & 174, are DENIED.

It is so ordered.

Date: February 20, 2025         s/ Toby Crouse
                                Toby Crouse
                                United States District Judge